IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 17, 2011 Session

## MICHAEL BLAINE WARD, II v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 34417     Vanessa A. Jackson, Judge**

---

**No. M2011-00122-CCA-R3-PC - April 20, 2012**

---

The Petitioner, Michael Blaine Ward, II, appeals the Coffee County Circuit Court's denial of post-conviction relief from his convictions for especially aggravated kidnapping, attempted second degree murder, aggravated spousal rape, aggravated robbery, and aggravated burglary, and resulting effective sentence of twenty-one years. On appeal, he contends that trial counsel rendered ineffective assistance by failing to (1) adequately investigate and prepare for trial, (2) give proper written notice of an alibi witness, (3) present material evidence at the trial, (4) object to inadmissible evidence and prosecutorial misconduct, (5) require the State to elect a single means by which the charged offenses were committed, (6) object to improper jury instructions, (7) preserve issues for appeal, and (8) object to his prosecution under Tennessee Code Annotated section 39-14-404. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH, J., and DONALD P. HARRIS, SR. J., joined.

Robert L. Jolley, Jr. (on appeal) and Anthony Avery (at trial), Knoxville, Tennessee, and J. Michael Clement (at trial), Clinton, Tennessee, for the appellant, Michael Blaine Ward, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Mickey Layne, District Attorney General; and Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Petitioner was sentenced to concurrent terms of twenty-one years for especially aggravated kidnapping, eleven years for attempted second degree murder, eleven years for aggravated spousal rape, eleven years for aggravated robbery, and five years for aggravated burglary. This court affirmed the judgments of the trial court and recited the facts of the case in State v. Michael Ward, II, No. M2003-00734-CCA-R3-CD, Coffee County, slip op. at 1-6 (Tenn. Crim. App. June 22, 2004), perm. app. denied (Tenn. Aug. 28, 2006):

> The victim . . . was married to the Defendant on November 9, 1997. They separated in August of 2000. The Defendant moved out, leaving [the victim] to care for her three children and the Defendant's son. In October of 2000, [the victim] obtained an order of protection against the Defendant which prohibited direct communication between them and which also denied the Defendant access to [the victim's] residence. [The victim] moved to a new residence in November of 2000. [The victim] testified that the Defendant violated the order of protection numerous times by calling her, spying on her, following her, and threatening her. He told her that he wanted to get back together with her and that he was addressing his problems with medication and therapy. On one occasion, while [the victim] was returning home from shopping, she noticed someone in the back of her van. When she got home, she and her sister . . . opened the back of the van and found the Defendant. He got out of the van and walked away from them. He later returned to their home yelling profanities and demanding that [the victim] give him his son, which she ultimately did. Approximately thirty minutes later, the Defendant returned and apologized, saying "he just wanted [the victim] back in his life, and he was going to do whatever it took."
>
> On the night before the attack that is the subject of this appeal, the Defendant sent [the victim] several electronic pages using a numeric code that they devised while they were married. According to [the victim], the pages read, " 'Till death do us part" and "Death by rape." [The victim] did not take the pages seriously because she was accustomed to his threats.

On the next day, November 20, 2000, the Defendant called [the victim] at her office in the early afternoon. He apologized for the pages and said that he had a chemical imbalance. He assured her that he was in therapy and he would work his problems out so that he could be good to her and the children. A few minutes after 10:00 that evening, [the victim] made a trip to her old residence to do laundry and make telephone calls because her washing machine and phone were still located there. As she was about to leave through the front door, someone forced the door closed. She felt an arm go around her neck and force her into "a headlock position." Then she felt several blows to the left side of her head. She yelled for the Defendant to stop, but he did not. She urinated and collapsed to her knees. The Defendant forced [the victim] onto her back and planted his knees on her chest while he continued hitting her in the head with his fists. The victim testified that "he looked right at me in my eyes, and then he started to choke me." The victim kept saying their daughter's name, hoping to "snap [the Defendant] out of it." Eventually the victim lost consciousness.

When she regained consciousness, she was still on the floor, but the Defendant had removed her pants and was "pulling [her] up onto [her] knees." As he did so, he told her to not make a sound, and he hit her a few more times in the head. The Defendant then anally penetrated the victim with his penis for thirty seconds or a minute. The Defendant then rolled her onto her back and climbed on top of her. [The victim] kicked him, but that "just made him madder." In her words, "He told me he was going to kill me, and he put his arms and his hands around my neck, and that time, I wanted him to just finish it, just go, but I just went unconscious. I didn't die."

When [the victim] regained consciousness the second time, she was naked on the floor in her van. She heard the Defendant say that he had a place picked out where he was going to dump her body, and he would get away with it. The victim looked out the window and saw a sign for Sewanee; therefore she knew that she was near Monteagle. She found her clothes on the floor of her van, but they were wet with urine. She testified that the Defendant said he could not believe that she was alive. He also

said "he thought for sure he had [her] that time." [The victim] testified that the Defendant had a metal pipe with him that was "about two feet long" and "heavy." The Defendant threatened to hit her with it. For about an hour [the victim] stayed down, and the Defendant talked about where he was going to bury her. Eventually the victim began begging the Defendant to let her sit up front with him so they could work things out. She kissed and held his hand, and he let her sit in the front seat. [The victim] explained to him that she needed to get home so her daughter would not be worried. The Defendant apologized and said that, if he took her home, she would have to wait until after 6:00 a.m. to call the police so he would have time to kill himself. [The victim] promised to abide by his wishes, and he eventually let her go at an automobile body shop. He gave her his "84 Lumber" cap, his watch, his necklace, and his wedding ring to give to his children "to remember him by."

After the Defendant got out, [the victim] immediately left in her van. She got lost, but she eventually got home between 3:00 and 3:30 in the morning. Shortly after she got home, the Defendant returned in his truck. He stopped in front of her house, honked his horn, and placed an object in her mailbox, which turned out to be a cassette tape of his "last will and testament" and a statement to the victim and their children.

Eventually the police came, and [the victim] was taken to the emergency room, where she stayed for approximately three hours. Meanwhile, the Defendant called the victim's former residence and left a message on her answering machine. In the message, he apologized and asked her to page him on the pager he took from her. In addition to the pager, she determined that the Defendant had taken eighty dollars from her. Acting on the advice of police officers, the victim contacted the Defendant and arranged a meeting, and the police apprehended him.

[The victim] testified that, after the attack, her "whole body hurt." Her head hurt and was swollen, so doctors performed a CAT scan. She was unable to take a shower for days because of the pain. When she finally did, her mother had to help her. She was unable to wash or brush her hair because her head was so sore, and she had trouble urinating. Her doctor prescribed

Zoloft for anxiety and depression, which were associated with post-traumatic stress syndrome that occurred months after the attack. She was prescribed Remeron for nightmares. She had to take Xanax for her anxiety. In her words,

> I wouldn't leave my house, and I wouldn't get in my car. I was afraid he was in my car. I called the police department on a daily basis to see if he was still in jail because I thought he would escape, so they kept changing the Zoloft to Paxil to Prozac. Nothing was working.

Dr. Christopher Smith was working in the emergency room at Manchester Medical Center on November 21, 2000, and he treated the victim. He explained that [the victim] had "multiple trauma to her face and to her extremities and a lot of bruising." She had low blood pressure, slow, deliberate speech, and diminished memory, which are all signs of shock. She was depressed and anxious. There were "microhemorrhages behind [her] eyes that showed trauma to the head." These microhemorrhages are also consistent with having been choked. The doctor noted much swelling and bruising about [the victim's] face, and her neck muscles were spasming, which indicates trauma to the neck. She complained of pain in her abdomen. Dr. Smith also testified that there was evidence of rectal penetration, there was bruising and fecal material around her rectum, and there was trauma to the vaginal area. Dr. Smith explained that severe head trauma and being choked to the point of unconsciousness can cause a person to lose control of their bowels. [The victim] had a poor range of motion in her upper and lower extremities due to tenderness in those areas. The doctor said that the victim suffered bruising to her throat, chest, left shoulder, arm, thighs, rectum, and face, and the bruising to her face was accompanied by swelling. Dr. Smith testified that all of the victim's injuries were consistent with her explanation of how the Defendant attacked her. When the doctor was asked whether there was a substantial risk that [the victim] could have died during the assault and rape, Dr. Smith replied, "With the amount of trauma, she could have, yes." On cross examination, Dr. Smith said that the victim did not suffer any broken bones during the attack.

The victim's sister . . . testified that, when the victim finally got home close to 4:00 a.m. on November 21, she was "bleeding from head to toe," wearing nothing but socks and a jacket, and screaming, "I'm alive." The victim had a black eye, her body was "all bruised up," and blood was "all over her face." [The victim's sister] ran to a neighbor's house, but no one answered the door. Therefore she drove to the home of Billy Butler, a police officer from whom she and [the victim] were renting their house, and called the police. Detective Butler testified that he did not get out of bed or respond himself because he was not on duty and he did not know that the problem had occurred at his rental property.

Detective Ray Stewart, Jr., an investigator with the Manchester Police Department, responded to [the sister's] call. He testified that "it was obvious [the victim] had sustained an extensive beating." She had marks all over her face and hands, her eyes were swollen-one almost shut, her mouth was swollen, and she was very upset. Detective Mark Yother also testified that the victim had been "beaten very badly." He searched [the victim's] van and found her jogging pants, which were "soaked" with urine. He also found the Defendant's ring, watch, necklace, hat, and jacket. Detective Yother was at the victim's former residence when the Defendant called and left a message on which he said that "they needed to talk about what had happened last night" and asked the victim to page him. At the request of the police officers, [the victim] paged the Defendant; he called, and they agreed to meet in Cookeville. On the way there, the police officers spotted the Defendant and took him into custody.

Joe Miner, a forensic scientist with the Tennessee Bureau of Investigation, testified that the vaginal and anal swabs that were taken from the victim tested positive for the presence of semen. The sperm did not match a sample of DNA taken from the victim's boyfriend. Mr. Miner testified that he was not able to rule out the Defendant as a possible donor of the semen; however, he was also unable to say that it was, in fact, the Defendant's semen. He did testify that, statistically speaking, he was able to rule out 95% of the world's Caucasian male population as potential donors based on his analysis of the vaginal swab. Based on his analysis of the anal swab, which

was a more complete sample, he testified he could rule out 99.5% of the population.

Douglas Coulter, the victim's ex-husband, testified on behalf of the Defendant. He stated that, on one occasion while they were married, he and [the victim] had a big fight. She hit him, and he hit her back. She responded by calling the police and got a restraining order against him.

Jared Genta, an acquaintance of the victim, testified for the Defendant that he attended a party at the victim's house shortly after the attack. He said that the victim had [a] small "lesion" on her eye, but she otherwise appeared to be fine. They all drank and smoked marijuana, and [the victim] was kissing some man that she said was the Defendant's boss. On cross[-]examination, Mr. Genta identified a photograph of the victim's former residence as the location of the party. However, at the time the party was supposed to have occurred, the victim no longer lived there, and it was completely empty.

Linda Genta, the Defendant's sister and friend of the victim, testified that [the victim] told her she was dating her landlord, Billy Butler. She also testified that [the victim] once told her how to fabricate evidence of spousal abuse in order to be granted full custody of children in a divorce action. In fact, Ms. Genta claimed to have seen the victim bruise herself by hitting herself in the cheek with a toothbrush holder. She also testified that the victim told her that anal sex was the best sex she had ever had because it afforded her "instant gratification," and she engaged in anal sex with the Defendant somewhat regularly while they were married.

Vickie Matthews, the Defendant's aunt, testified that the Defendant arrived at her house in Knoxville around 6:00 or 6:15 a.m. on the morning of November 21, 2000. She estimated that it would take three to three-and-one-half hours to go from Coffee County, where the crimes occurred, to her house in Knoxville. Ms. Matthews also testified that [the victim] once told her at a party how to obtain a favorable divorce. [The victim] advised her to bruise herself, act differently, and tell

people that her husband had "grabbed" or "shoved" her, and she would get everything she wanted.

The Defendant also testified. He said that [the victim] was a heavy drinker and took Paxil. He also said that she violated the restraining order by calling him and coming around him. He testified that he engaged in anal sex with the victim while they were married, but it was never forced. The Defendant maintained that he was sick on November 19 and 20. On the night of the 20th, [the victim] came to his house. According to him, they engaged in oral sex, but no intercourse. Later in his testimony, he said that they did have sexual intercourse, but it was consensual. Later that night, he and [the victim] got into an argument over the custody of the children, and he told her to leave. He testified that he then "pushed" her out the door. She left her pager at his house. The Defendant also stated that he borrowed about fifty dollars from [the victim], and he gave her his hat, jacket, necklace, watch, and ring as "collateral." Shortly after [the victim] left, the Defendant departed for Knoxville.

The Defendant specifically testified that he did not try to kill the victim; he merely pushed her out of his house. He also denied making any threats to her. Likewise, he denied taking her anywhere, and stated that he did not go to her house. He said that he did not rob her; he "borrowed" fifty dollars. Furthermore, he testified that he did not even know how to get to Monteagle. The Defendant opined that [the victim] brought these charges against him to gain an advantage over him in their divorce. However, the State introduced as an exhibit their marital dissolution agreement, which was signed by both the Defendant and [the victim] on November 17, 2000, three days before the attack.

The State called the victim's former boss, Tammy Patterson, as a rebuttal witness. Ms. Patterson testified that the Defendant did violate the order of protection by calling and spying on [the victim] while she was at work. The Defendant's behavior frightened all the employees, and Ms. Patterson eventually had him arrested. She also testified that there was no relationship between [the victim] and Detective Billy Butler. Finally, she said that when the victim returned to work after the attack, she

was scared and embarrassed, and she was "never the same person."

At the post-conviction hearing, the Petitioner testified that trial counsel did "nothing" to investigate the case and that trial counsel stated he did not need to interview the medical personnel who examined the victim because he thought the medical report contained all of the information about which they could testify. The Petitioner said he and trial counsel did not know that Dr. Smith would testify that the victim suffered a serious bodily injury because the medical report merely stated that the victim suffered mild bruising and was given two Tylenol before being sent home. He stated that although the victim said she was near Monteagle at 3:00 a.m. and her sister said the victim returned to her home in Manchester at 4:00 a.m., trial counsel did not investigate to determine if the victim could have traveled between the two places in that time frame, as requested by the Petitioner. He claimed trial counsel also failed to investigate the DNA evidence taken from the victim and the victim's statement to hospital personnel that she was attacked outside of her home and forced back inside. He said counsel did not determine if the victim was given a blood alcohol test while at the hospital and failed to investigate if the victim had a romantic relationship with Detective Butler.

The Petitioner testified that he told trial counsel that he was not present when the victim was attacked and that he was at the home of Vickie and Phillip Matthews shortly after the attack. He said that although Ms. Matthews testified at the trial, Mr. Matthews was not allowed by the trial court to testify because counsel failed to list Mr. Matthews on the notice of alibi witness.

The Petitioner testified that he and trial counsel discussed the admissibility of testimony regarding an arrest warrant taken against him by the victim's sister and his violating orders of protection. He said counsel told him that although the testimony was not admissible, counsel did not object to the testimony because it was something they could "use on appeal." He did not know why counsel failed to object to testimony that the Petitioner refused to give a statement after his arrest or to the assistant district attorney's statement during his closing argument that he brought "truth" to the courtroom.

The Petitioner testified that he did not have injuries to his hands or feet when he was arrested and that although he told jail personnel and trial counsel, counsel failed to present evidence of the lack of injuries. He said counsel also failed to present evidence that the Petitioner had a back injury at the time of the attack that made it impossible for the Petitioner to lift or drag the victim to the van. He said counsel discussed the charged crimes and what the State would need to prove at the trial, but he did not know if counsel discussed if the

Petitioner could be tried for especially aggravated kidnapping and the other offenses at the same time.

On cross-examination, the Petitioner agreed the defense theory was to show that the victim falsely accused him of the attack and improperly sought orders of protection to obtain a more favorable result in their divorce proceeding and that she began dating Detective Butler to accomplish her plan. He did not remember that counsel expressly stated that there was no objection to the admission of an order of protection or that counsel introduced a document relating to a previous arrest.

The Petitioner agreed that trial counsel obtained copies of the victim's medical records and reviewed those records with the Petitioner before the trial. He agreed they did not anticipate that Dr. Smith would elaborate beyond the information in the medical records. He did not remember if counsel objected after Dr. Smith testified regarding a substantial risk of death. The Petitioner agreed that an officer was asked about the lack of injuries on the Petitioner's hands when he was arrested. He said that although he asked counsel to perform independent DNA tests of the evidence, they did not receive "anything to conduct a test on."

Vickie Matthews testified that she was the Petitioner's aunt and that before the trial, trial counsel spoke with her and her husband about the Petitioner's whereabouts on the morning of the crimes. Although she was allowed to testify at the trial, her husband was not. On cross-examination, Ms. Matthews testified that Mr. Matthews would have been able to verify what she told the jury and agreed that his testimony would have been essentially the same as her own.

Phillip Matthews testified that he was called as a defense witness at the Petitioner's trial but was not allowed to testify. He said he would have testified that the Petitioner was at his home on the Tuesday before Thanksgiving when he awoke between 10:00 and 10:15 a.m.

Linda Genta testified that she was the Petitioner's sister and that she was in contact with trial counsel during the trial. She said trial counsel knew that Mr. Matthews was available as a witness. She was aware that on direct appeal, trial counsel raised an issue relating to the admission of testimony regarding the Petitioner's violating an order of protection.

Trial counsel testified that while investigating the Petitioner's case, he spoke with witnesses who saw the victim at a party thrown at her home shortly after the attack. He said he spoke with Mr. Coulter, the victim's ex-husband, who stated that the victim made false allegations against him during their divorce proceedings. He agreed a defense theory was

that the victim and her sister falsely accused the Petitioner of domestic abuse and other acts to gain an advantage during her divorce proceedings. He discussed the theory with the Petitioner and the Petitioner did not object to it. He said evidence regarding orders of protection against the Petitioner was "certainly part of that theory of why [the victim's] trumped-up allegations against [the Petitioner] were being used." He said the victim was a believable witness and difficult to impeach at the trial.

Trial counsel testified that because he became involved with the case after the Petitioner was indicted, he did not have much of an opportunity to investigate the relationship between Detective Butler and the victim. He attempted to find photographs or receipts establishing a relationship but was unable to find either. He said that at the trial, Detective Butler admitted he was the victim's landlord but denied having a sexual relationship with her. Counsel agreed Dr. Smith's medical report did not allege that the victim suffered serious bodily injury. He said that Dr. Smith's testimony at the trial was damaging to the defense and that it included facts not stated in the medical report, including testimony that the victim hemorrhaged behind her eye, showing evidence of strangulation. He said that he attempted to limit Dr. Smith's testimony to the facts contained in the medical report and that although he wished he had hired a doctor to impeach Dr. Smith's testimony, it was not financially possible.

Trial counsel testified that he did not recall why Mr. Matthews did not testify at the trial but that Mr. Matthews did not add anything to Ms. Matthews's testimony because Ms. Matthews was not impeached and Mr. Matthews would have testified to the same facts mentioned by Ms. Matthews. He searched for witnesses to corroborate the Petitioner's alibi that he was at a Huddle House restaurant in Crossville around the time of the crimes but was unable to find any. He agreed the Petitioner was indicted for especially aggravated burglary but was convicted of aggravated burglary. He said he cross-examined police officers about their mishandling of evidence, including a bag labeled as containing the Petitioner's underwear but actually containing socks.

On cross-examination, trial counsel testified that although there "might have been a little bit of a preliminary hearing," in his opinion no preliminary hearing was conducted because "no questions of a substantial nature whatsoever were asked by the Public Defender." He said the hearing was "just an explanation of the victim's statement to get the warrants issued." He said the victim was not asked about her whereabouts during the crimes or if she suffered serious bodily injury.

Trial counsel did not remember what was contained in the victim's pretrial statement to the police but testified that it "mirrored" her testimony at the trial. He said that he looked into the time frames alleged by the victim concerning her travels between Monteagle and her

home, that he was familiar with the areas and had driven the routes himself, and that although he did not think it was likely that she could have driven the distance in the stated time, it was "definitely possible." He said that the victim was not asked about the time frame on cross-examination and that no evidence at the trial disputed or corroborated the time frame she gave.

Trial counsel testified that he did not interview Dr. Smith or medical personnel who cared for the victim but that he examined the victim's medical records many times. He agreed her medical records stated that the victim was "reportedly assaulted outside the house, then forced back into the house." He did not contact any medical personnel about the statement. He did not know if the victim testified at the trial that she had been assaulted outside of her home but said she made many inconsistent statements. He knew that Dr. Smith would testify about whether the victim suffered serious bodily injury, but he did not think the medical records showed that the victim suffered serious bodily injury. He recalled Dr. Smith stating that the Petitioner's conduct "could have" created a substantial risk of death and did not know why he did not object to that statement.

Trial counsel testified that in addition to asking the victim and Detective Butler if they had a sexual relationship, he attempted to establish that they had a relationship through the testimony of Ms. Genta. He did not remember if he listed Mr. Matthews's name on a notice of alibi witnesses but said he did not consider Mr. Matthews to be a significant alibi witness. He was aware that the Petitioner said he did not want to make a statement when he was arrested but did not know why no objection was made when Detective Yother mentioned the Petitioner's post-arrest silence.

Trial counsel testified that he did not raise a pretrial issue about the Petitioner's being prosecuted simultaneously under Tennessee Code Annotated section 39-14-404 and other sections but that he thought he filed proposed jury instructions that addressed the improper simultaneous prosecution. He was aware that the indictment, when describing the charged offenses, repeatedly referred to both the use of a weapon and the victim's suffering serious bodily injury. He did not ask the trial court to ensure jury unanimity by requiring one factor or the other be found when convicting the Petitioner and did not ask the trial court to require the State to elect a means by which the offenses were committed. He agreed that he did not object at the trial to evidence of the Petitioner's violating orders of protection but that he challenged the evidence on direct appeal.

Trial counsel testified that he did not object when the assistant district attorney stated that his client was "the truth, and that is what I bring to the courtroom," because he rarely objected during closing arguments and did not feel that the statement was a "substantial detriment" to the Petitioner's case. He remembered the victim stating at the trial that the

Petitioner was armed with a metal club during the crimes and agreed that the State presented a wooden club at a pretrial hearing. He said the trial court ruled that the weapon could not be introduced at the trial but allowed testimony regarding the weapon.

Trial counsel testified that he spoke with the Petitioner before the trial regarding injuries to the Petitioner's hands when the Petitioner was arrested. He said that photographs of the Petitioner's hands did not show substantial injuries and that he did not introduce the photographs at the trial, but that the Petitioner was questioned at the trial about the lack of hand injuries. He said that shortly before the trial, the Petitioner informed him that the Petitioner had back problems at the time of the crimes. He did not investigate the Petitioner's back injury or ask him about it during the trial. He agreed that the indictment alleged the Petitioner carried the victim from her home to the van and that evidence establishing that the Petitioner was physically incapable of doing so would have helped the defense. He thought the Petitioner testified about his back problems at the trial. He agreed that the indictment stated the Petitioner raped the victim in the van but that the victim never stated at the trial that she was raped in the van. He agreed pointing out the inconsistency would have helped the defense. He said that he was aware of the definition for "knowingly" at the time of the trial and that he thought the trial court gave the jury instruction he requested regarding the definition. He did not object to the jury instruction.

Co-counsel testified that he was hired to assist trial counsel during the trial and that he was not involved with investigating the case or interviewing witnesses. He thought trial counsel investigated the routes the victim stated she drove on the night of the attack and the time frame mentioned by the victim. He reviewed the victim's medical records but was surprised by Dr. Smith's testimony at the trial that the victim was subject to a substantial risk of harm. He said Dr. Smith testified about information that was not contained in the medical records. He agreed that Mr. Matthews was not allowed to testify at the trial because he was not included on the witness list but said Mr. Matthews's testimony would have been similar to that of Ms. Matthews.

Co-counsel testified that the defense strategy was to show that the victim used Detective Butler to file "trumped-up" allegations against the Petitioner in order to gain an advantage during their divorce proceedings. He agreed testimony regarding the orders of protection was necessary to support the defense strategy. He did not recall the Petitioner questioning if evidence relating to the orders of protection should have been admitted. He said it was a mistake not to object to the State's mentioning of the Petitioner's post-arrest silence. He said it was a strategic decision to have the wooden club suppressed before the trial.

-13-

On cross-examination, co-counsel testified that he did not know if trial counsel explained to the Petitioner that counsel wanted to introduce evidence of the orders of protection to support the defense theory. He agreed there was no evidence showing a relationship between the victim and members of the Coffee County Sheriff's Department. He said that the victim's medical records did not state she suffered serious injuries but that in his experience, reports did not always reflect everything to which a witness could testify. He agreed that although the medical report stated the victim was "reportedly assaulted outside the house – then forced back into the house," the victim did not testify at the trial that she was attacked outside her home. He said interviewing the medical personnel who created the report and pointing out the inconsistency could have "bolstered our theory."

Co-counsel testified that not objecting when Detective Yother mentioned that the Petitioner asserted his right to remain silent was not part of the trial strategy. He said he should have forced the State to charge the Petitioner under either Tennessee Code Annotated section 39-14-404(d) or another applicable section. He did not remember requesting that the State elect whether the offenses were committed through the use of a deadly weapon or by causing serious bodily injury and said the failure to require the election was a mistake. He agreed the indictment stated that the victim was sexually assaulted in her home and in the van. He did not know if the victim was asked on cross-examination if she was assaulted in the van and said a failure to do so would have been an error.

Co-counsel testified that he did not remember the prosecutor's stating during closing arguments that his client was "the truth, and that's what I bring to the courtroom." He said such a statement would be inappropriate. He did not know if the Petitioner mentioned having a back injury at the time of the offenses and was not aware of an investigation into the injury. He agreed he should have objected when Dr. Smith testified that there "could have" been a substantial risk of death during the offenses.

In denying the petition, the trial court found that the Petitioner did not establish that trial counsel failed to investigate the case adequately. It found that trial counsel personally drove to the locations mentioned by the victim and that the investigation showed the time frame alleged by the victim was possible. The trial court found that the Petitioner failed to present credible evidence that the victim and Detective Butler had a romantic relationship. It found that the Petitioner also failed to show that interviews with medical personnel would have revealed evidence not contained in the medical report or evidence to refute the notion that the victim suffered serious bodily injury. The trial court found that the medical records showed the victim suffered "serious bodily injury, including multiple injuries to her face and her extremities, including micro-hemorrhages in her eyes" and that Dr. Smith's testimony was consistent with the information contained in the medical records. It also found that the

Petitioner failed to introduce clear and convincing evidence of his lack of physical injuries and general physical condition at the time of his arrest.

With regard to counsel's failure to list Mr. Matthews as an alibi witness, the trial court found that the Petitioner failed to establish that he was prejudiced because Mr. Matthews's testimony that he saw the Petitioner at 10:00 a.m. in Knoxville would not have provided the Petitioner with an alibi for his whereabouts at 2:00 and 3:00 a.m. when the crimes occurred. The trial court found that counsel's failure to object when Detective Yother mentioned the Petitioner's post-arrest silence was not prejudicial because the testimony did "not in any way suggest that an inference of guilt should be drawn" from the Petitioner's silence. It also found that counsel were not deficient for failing to require the State to elect a single means by which the charged offenses were committed because the State was not required to elect a specific action when "the acts of the defendant constitute a 'continuous criminal action' over a short span of time. . . ."

The trial court found that although trial counsel failed to object to the trial court's definition of "knowingly" when giving the second degree murder instructions, no prejudice resulted because the definition merely contained "superfluous" language that was not reasonably likely to mislead the jury into convicting the Petitioner. With regard to counsel's failure to object when the prosecutor stated during his closing argument that his client was "the truth," the trial court found that the statement did not rise to the level of prosecutorial misconduct because it was a generalized statement and did not express the prosecutor's opinion as to the credibility of a particular witness or piece of evidence. It also found that the statement was not prejudicial to the Petitioner because it was isolated and brief. With regard to counsel's failure to object to the Petitioner's simultaneous prosecution under Tennessee Code Annotated section 39-14-404 and other sections, the trial court found that the Petitioner was not prejudiced because the Petitioner's conviction for especially aggravated burglary was amended to aggravated burglary.

Relative to the preservation of issues for appeal, the trial court found that trial counsel's decision not to object to evidence of orders of protection was a strategic decision that supported the defense theory. It found that although counsel did not include an issue in the motion for a new trial regarding the State's failure to preserve the wooden club or the Petitioner's underwear, counsel were not deficient and the Petitioner was not prejudiced because there was no evidence that the State was negligent by failing to preserve these items and no showing that the evidence was exculpatory. The trial court also found that the evidence introduced at the trial was "more than sufficient" to support the convictions. The trial court held that the Petitioner failed to establish that he received ineffective assistance and denied the petition. This appeal followed.

The burden in a post-conviction proceeding is on a petitioner to prove the allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

**I**

The Petitioner contends that trial counsel rendered ineffective assistance by failing to investigate and prepare for trial adequately. He argues that counsel failed to investigate the victim's injuries to determine if she suffered serious bodily injury, failed to ask medical personnel about the description of the attack contained in the victim's medical records, failed to investigate the timeline of events and driving routes mentioned by the victim, and failed to investigate the relationship between the victim and Detective Butler. He argues that he was prejudiced by these failures because they resulted in an "unreasonable theory of defense," which led to the admission of prejudicial evidence of the Petitioner's violating orders of protection. The State contends that the Petitioner failed to establish that counsel were deficient or that he was prejudiced by any claimed deficiency. We agree with the State.

Defense counsel have a duty to confer with clients to determine potential defenses and strategies and a duty to conduct appropriate investigations to determine what matters of defense can be developed. See Baxter, 523 S.W.2d at 932-33.

> This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999).

> When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. . . . [A] trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel . . . . In short,

if a petitioner is able to establish that defense counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by Strickland v. Washington.

Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).

With regard to an investigation of the victim's injuries, trial counsel testified that they examined the victim's medical records many times but did not interview Dr. Smith or other medical personnel who cared for the victim. Counsel did not think the medical records established that the victim suffered a serious bodily injury and were surprised by Dr. Smith's testimony at the trial that the victim was subject to a substantial risk of death. Although counsel's interpretation of the victim's medical records shows that they did not anticipate Dr. Smith testifying that the victim suffered a serious bodily injury, the trial court correctly noted that Dr. Smith's testimony was consistent with the information contained in the medical records. Tennessee Code Annotated section 39-11-106(a)(34) (2006) (amended 2009, 2011) states that bodily injury accompanied by protracted unconsciousness qualifies as serious bodily injury, and the victim's medical records state that the victim informed the medical personnel that she lost consciousness twice while being strangled and that she suffered multiple injuries to her face and limbs, micro-hemorrhages in her left eye, and abrasions and swelling around her throat. Speaking with medical personnel would have revealed little, if any, information not already contained in the report.

The Petitioner contends that he was prejudiced by trial counsel's failure to speak with medical personnel about the victim's injuries because "knowledge of this additional material evidence would have assisted trial counsel in constructing a defense." Although the Petitioner asserts that trial counsel's failures led to an "unreasonable theory of defense" and the admission of prejudicial evidence, he asserts no alternate defense that would have been made available through a better understanding of the victim's injuries. He also does not state how a better understanding of the victim's injuries would have allowed trial counsel to rebut Dr. Smith's testimony. Furthermore, trial counsel agreed that the defense theory was to show that the victim and her sister falsely accused the Petitioner of domestic abuse and other acts to gain an advantage during their divorce proceedings. Trial counsel said that they discussed the theory with the Petitioner, that the Petitioner did not object to the defense theory, and that evidence regarding the orders of protection was necessary to support the defense strategy.

-18-

The Petitioner has not shown that a reasonable probability exists that, but for counsel's failure to speak with medical personnel about the victim's injuries, the result of the proceeding would have been different.

With regard to an investigation of the description of the attack contained in the victim's medical records, although the records state that she was "reportedly assaulted outside the house and then forced back into the house," the victim testified at the trial that the assault occurred in her home and did not mention that she was assaulted outside. The Petitioner contends that trial counsel's failure to discuss the statement with Dr. Smith rendered trial counsel unable to cross-examine the victim and Dr. Smith effectively regarding the victim's inconsistent testimony at the trial. We disagree. Speaking with medical personnel would have done little to bolster the ability of trial counsel to cross-examine the victim or Dr. Smith. The victim's medical records already contained the statement that she was attacked outside of the home and she testified at the preliminary hearing that she was attacked within the home as she walked toward the front door to leave the home. The victim and Dr. Smith could have been asked about the inconsistency during cross-examination. The Petitioner has not shown that trial counsel failed to investigate adequately the description of the attack contained in the medical records or that he was prejudiced as a result.

With regard to the investigation of the timeline of events and driving routes mentioned by the victim, the victim testified at the trial that the Petitioner released her about 3:00 a.m. near Monteagle, and her sister testified that the victim returned home around 4:00 a.m. Trial counsel testified that he investigated the time frames alleged by the victim concerning her travels between Monteagle and her home, that he was familiar with the areas and had driven the routes himself, and that although driving the distance in the stated time was not likely, it was "definitely possible." The record does not preponderate against the trial court's finding that counsel drove to the locations mentioned by the victim and that his investigation revealed the time frame alleged by the victim was possible. Furthermore, the Petitioner offered no evidence that the victim could not have driven the distance in the time alleged. The Petitioner has not shown that counsel failed to investigate adequately the timeline of events and driving routes mentioned by the victim or that he was prejudiced as a result.

With regard to the investigation of a relationship between the victim and Detective Butler, trial counsel testified that they attempted to find photographs or receipts establishing a relationship between the victim and Detective Butler but were unsuccessful. At the trial, in addition to asking the victim and Detective Butler if they had a sexual relationship, counsel attempted to establish the relationship by presenting the testimony of Ms. Genta, who testified that the victim told her she was dating Detective Butler. The Petitioner presented no evidence that the victim and Detective Butler had a romantic relationship or that further investigation into the matter would have revealed evidence favorable to the defense. The

Petitioner has not shown that counsel failed to investigate the relationship between the victim and Detective Butler or that he was prejudiced as a result. The Petitioner is not entitled to relief.

## II

The Petitioner contends that trial counsel rendered ineffective assistance by failing to give proper written notice that Mr. Matthews would testify as an alibi witness, which disqualified Mr. Matthews from testifying at the trial. He argues that Mr. Matthews could have corroborated Ms. Matthews's testimony and established that the Petitioner was in Knoxville at 6:00 a.m. on the morning of the attack. The State contends that the trial court properly determined that the Petitioner was not prejudiced by the error. We agree with the State.

If requested by the State, a defendant must serve on the district attorney general a written notice of his intention to offer alibi witnesses. Tenn. R. Crim. P. 12.1(a)(2). The notice must contain the place at which the defendant claims to have been at the time of the alleged offense and the name and address of each alibi witness on which the defendant intends to rely. Id. If a defendant fails to comply with this request, the trial court may exclude the testimony of the undisclosed witness. Tenn. R. Crim. P. 12.1(d). If a petitioner is able to establish that defense counsel was deficient by failing to call a known witness, the petitioner is not entitled to relief unless the witness could have been found by a reasonable investigation and would have testified favorably in support of the defense if called. Black, 794 S.W.2d at 757-58.

Counsel admitted that Mr. Matthews was not permitted to testify at the trial because he was not included on the list of alibi witnesses. Mr. Matthews stated that he would have testified that the Petitioner "was at my house on the Tuesday before Thanksgiving of 2000 when I got up between 10 and 10:15." Despite this error, the trial court found that the Petitioner failed to establish prejudice because Mr. Matthews's testimony would not have provided the Petitioner with an alibi for his whereabouts at 2:00 and 3:00 a.m. when the crimes occurred. We agree. Ms. Matthews testified at the trial that the Petitioner arrived at her house in Knoxville around 6:00 or 6:15 a.m. on the morning of November 21, 2000. Mr. Matthews's testimony would have done nothing to establish the Petitioner's whereabouts at the time of the crimes and would not cooroborate testimony that the Petitioner was in Knoxville around 6:00 a.m., four hours before Mr. Matthews encountered him. The Petitioner has not established that there is a reasonable probability that, but for counsel's failure to disclose Mr. Matthews as an alibi witness, the result of the proceeding would have been different. The Petitioner is not entitled to relief.

# III

The Petitioner contends that trial counsel rendered ineffective assistance by failing to present material evidence at the trial. He argues that counsel should have presented evidence of his back injury to establish that he could not have carried the victim to the van and to cast doubt on whether he was physically capable of committing the crimes. He also argues that counsel should have introduced evidence of the inconsistencies between the victim's description of the attack at the trial and other evidence in the record. With regard to the Petitioner's physical capabilities, the State argues that the Petitioner failed to establish prejudice because he did not present evidence establishing that he had a back injury at the time of the crimes. With regard to presenting evidence of the victim's inconsistent statements, the State argues that the Petitioner has waived this issue by failing to include it in the petition for post-conviction relief and, alternatively, that the Petitioner has failed to establish prejudice. We hold that the Petitioner has failed to establish that he was prejudiced by any claimed deficiency.

A petition for post-conviction relief must state all known post-conviction claims. See T.C.A. § 40-30-104(d) (2010) ("The petitioner shall include all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all such claims are included."). A ground for relief is waived if a petitioner fails to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented. T.C.A. § 40-30-106(g) (2010).

With regard to evidence of the Petitioner's back injury at the time of the attack, trial counsel testified that shortly before the trial, the Petitioner informed him that the Petitioner had back problems at the time of the crimes. Trial counsel did not investigate the injury or ask about it during the trial, but the Petitioner testified briefly at the trial about a back injury that limited the amount of weight he could lift. At the post-conviction hearing, the Petitioner testified that he had a back injury at the time of the attack and that he would not have been able to lift or drag the victim to the van. The trial court found that the Petitioner failed to establish that counsel were deficient on this issue because the Petitioner failed to introduce clear and convincing evidence of his general physical condition at the time of his arrest. We agree. The Petitioner's testimony regarding his back injury was presented to the jury at the trial and he offered no evidence at the post-conviction hearing that trial counsel could have used to corroborate his testimony on this point. The Petitioner has not established that counsel were deficient by failing to introduce evidence of the Petitioner's injury or that he was prejudiced as a result.

With regard to evidence of inconsistencies between the victim's statements at the trial and other evidence in the record, although the Petitioner did not allege in his petition for

-21-

post-conviction relief that trial counsel were deficient by failing to introduce this evidence, the Petitioner raised this issue at the post-conviction hearing and elicited testimony regarding trial counsel's failure to point out the inconsistencies. We hold that the Petitioner has not waived this issue. See T.C.A. § 40-30-106(g)

The Petitioner notes that the victim testified that she was attacked from behind as she attempted to leave her home, that she did not testify she was raped in the van, and that she said the Petitioner had a metal pipe while in the van. He also notes that the victim's medical records stated, "patient reportedly assaulted outside the house and then forced back into the house," that the affidavit of complaint stated the Petitioner raped the victim in her home and "several more times" in the van, and that the State presented a wooden club before the trial that they found in the van about a week after the attack. The Petitioner argues that because the State's case was based "solely" on the victim's testimony, highlighting her inconsistent statements and undermining her credibility would have caused a different result. We disagree.

The Petitioner presented no evidence indicating who provided the descriptions of the attack contained in the medical records and the affidavit of complaint and therefore failed to establish that the victim provided an inconsistent description at the trial. With regard to the club the Petitioner had while in the van, the trial court suppressed the use or display of the weapon at the trial due to the State's failure to preserve the weapon after discovering it, but allowed the victim to testify about the weapon. Trial counsel testified that it was a strategic decision to suppress the wooden club. At the trial, the victim did not provide inconsistent testimony regarding the weapon. She testified that the Petitioner had a metal club while in the van and never indicated that the Petitioner was armed with a weapon made of wood. Because there was no weapon in evidence to compare the victim's testimony to, there was no evidence of a conflicting statement to present to the jury to undermine the victim's credibility.

Furthermore, the evidence against the Petitioner was strong and the victim's credibility was bolstered by evidence supporting her testimony. The victim's descriptions of the attack were corroborated by medical testimony showing that she had multiple injuries to her face and her extremities, including micro-hemorrhages in her eyes and neck spasms that were consistent with being strangled, bruising on her anus, and vaginal trauma. Her description of the attack was also corroborated by her sister and police officers who saw her shortly after the attack and described her as being bloody, swollen, and subject to an "extensive beating." The victim stated that she defecated on herself during the rape and the police recovered feces on the floor of her home where she claimed the rape occurred. See Michael Ward, II, slip op. at 7. After the attack, the Petitioner asked the victim to wait until after 6:00 a.m. to call the police so he would have time to kill himself. Later that morning,

he left a cassette tape in the victim's mailbox containing his "last will and testament." He also left a message on the victim's answering machine in which he apologized to the victim. We hold the Petitioner has not established that a reasonable probability exists that, but for counsel's failure to introduce evidence of inconsistencies between the victim's statements at the trial and other evidence in the record, the result of the proceeding would have been different.

**IV**

The Petitioner contends that trial counsel rendered ineffective assistance by failing to object to inadmissible evidence and prosecutorial misconduct. He argues that counsel's failure to object to Detective Yother's testifying that the Petitioner stated he did not want to speak after being arrested because "he had talked to the police before, and it had caused him problems," prejudiced him because it implied his guilt. He argues that counsel's failure to object to Dr. Smith's testifying that the victim "could have" been at a substantial risk of death prejudiced him because it lessened the State's burden of proof when establishing that the victim suffered serious bodily injury. He also argues that the prosecutor's statement during closing arguments that his "client is the people of Tennessee and my client is the truth, and that's what I bring to the courtroom," prejudiced him by affecting the jury's verdict to his detriment. The State contends that the trial court properly found that the Petitioner failed to establish that he was prejudiced by trial counsel's failure to object to these statements. We agree with the State.

With regard to testimony of the Petitioner's post-arrest silence, the State should neither comment on a defendant's post-arrest silence nor use it to impeach a defendant's testimony during trial. Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976). A witness's comment on a defendant's post-arrest silence may constitute harmless error if it is determined beyond a reasonable doubt that the error did not have a prejudicial effect upon the jury's verdict. See Honeycutt v. State, 544 S.W.2d 912, 917-18 (Tenn. Crim. App. 1976); State v. Deangelo Davis, No. W2008-00992-CCA-R3-CD, Shelby County (Tenn. Crim. App. June 26, 2009), perm. app. denied (Tenn. Oct. 19, 2009). "The evidence concerning the absence of any statement by the defendant at the time of his surrender must be weighed against the other, properly admitted evidence in order to determine its prejudicial effect on the minds of the jury." Honeycutt, 544 S.W.2d at 918.

Co-counsel admitted that failing to object to the mention of the Petitioner's post-arrest silence was a mistake and not a part of the trial strategy. We agree that Detective Yother's reference to the Petitioner's post-arrest silence was improper. See Braden, 534 S.W.2d at 660. Despite this error, the trial court found that the Petitioner was not prejudiced because the testimony was isolated, was not stated by the prosecutor, and did not "in any way suggest

-23-

that an inference of guilt should be drawn" from the Petitioner's decision to invoke his right to remain silent. We agree that the Petitioner failed to establish that he was prejudiced by this error.

The Petitioner cites Gravely v. Mills, 87 F.3d 779 (6th Cir. 1996), in support of his argument that an improper reference to a defendant's post-arrest silence prejudices a jury's verdict. Gravely is distinguishable from this case. Gravely involved a prosecutor's repeated references to the defendant's post-arrest silence and an invitation to the jury during closing arguments "to consider that silence as evidence of [the defendant's] guilt." Id. at 789. Here, Detective Yother made a single reference to the Petitioner's post-arrest invocation of his right to remain silent. The State made no reference to the Petitioner's post-arrest silence and there is no indication that the State sought to elicit Detective Yother's statement in order to establish that the Defendant committed previous bad acts or to create an inference of guilt. This court has previously found that an improper comment upon a defendant's right to remain silent made by one of the State's witnesses did not rise to the level of reversible error when the prosecutor made no reference to the defendant's silence, there was no indication that the prosecutor elicited the statement to raise an inference of guilt and no indication that the jury would draw an inference of guilt from the statement, and the evidence against the defendant was strong. See Deangelo Davis, slip op. at 7; State v. Terry Lucas, No. 01C01-9811-CC-00458, Robertson County, slip op. at 8 (Tenn. Crim. App. Jan. 13, 2000).

As in Deangelo Davis, the record in this case shows that the State made no reference to the Petitioner's post-arrest silence. There is likewise no indication that the State sought to elicit Detective Yother's statement in order to create an inference of guilt. Additionally, the evidence against the Petitioner was strong. The victim's descriptions of the attack were corroborated by medical testimony, the testimony of her sister and police officers who saw her shortly after the attack, and evidence found at the victim's home. The Petitioner told the victim that he would kill himself and left a cassette tape in the victim's mailbox containing his "last will and testament" and a message on the victim's answering machine in which he apologized. We hold the Petitioner has not established that a reasonable probability exists that, but for counsel's failure to object to testimony of the Petitioner's post-arrest silence, the result of the proceeding would have been different.

With regard to trial counsel's failure to object to Dr. Smith's testimony that the victim "could have" been at a substantial risk of death, the Petitioner claims that he was prejudiced because Dr. Smith's testimony effectively lessened the State's burden of proof when establishing that the victim suffered serious bodily injury. He argues that the proof regarding serious bodily injury was "not overwhelming" and that the proof showed only that the victim "may have" suffered a serious bodily injury. We disagree. The Petitioner's argument is essentially a challenge to the sufficiency of the evidence regarding whether the victim

suffered serious bodily injury. On direct appeal, this court concluded that there was "ample evidence" that the Petitioner caused the victim serious bodily injury. Michael Ward, II, slip op. at 7-8. The court found that in addition to Dr. Smith's testimony of a substantial risk of death,

> the Defendant himself was surprised to learn that [the victim] had survived the ordeal. Furthermore, [the victim] lost consciousness twice during the violent attack. The second time she remained unconscious long enough for the [Petitioner] to strip her naked, load her into the back of her van, and begin his trip to Monteagle. Finally, [the victim] testified about the extreme physical pain she suffered at the [Petitioner's] hands. She was unable to shower for days. She could not wash or brush her hair. She had trouble urinating. She testified that her "whole body hurt." Therefore, there was a clear showing of serious bodily injury.

Id. The Petitioner has not established that a reasonable probability exists that, but for counsel's failure to object to Dr. Smith's testimony, the result of the proceeding would have been different.

With regard to the prosecutor's statement during closing arguments that his "client is the people of Tennessee and my client is the truth, and that's what I bring to the courtroom," a prosecutor should not assert his or her personal opinion as to the truth or falsity of any testimony or evidence or as to the guilt or innocense of the accused. State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989). In determining whether improper prosecutorial conduct could have affected the verdict to the prejudice of the defendant, the conduct must be viewed in context and in light of the facts and circumstances of the case, including whether the remarks were lengthy or repeated, or whether the statement was single or isolated. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). A court should also consider whether curative measures were taken by the trial court and prosecution, the intent of the prosecutor in making the statement, the cumulative effect of the improper conduct and any other errors in the record, and the relative strength or weakness of the case. Id.

The trial court found that the statement was not prosecutorial misconduct because it was a generalized statement and did not express the prosecutor's opinion as to the credibility of any particular witness or piece of evidence. It also found that the statement was not prejudicial to the Petitioner because it was isolated and brief.

-25-

Although the prosecutor's statement can be interpreted as an improper vouching for the truth of the State's evidence, we agree that it was isolated, brief, and did not express his opinion as to any individual piece of evidence or testimony. The cumulative effect of this statement is slight in light of this court's previous determination on direct appeal that no trial errors occurred, and our holdings in this case that any errors committed by trial counsel have not been shown to have prejudiced the Petitioner. Additionally, as noted above, the evidence against the Petitioner was strong. The victim's testimony was corroborated by medical experts, evidence found at the victim's home, and the Defendant's own statements after the crimes. We hold that the Petitioner has not established that a reasonable probability exists that, but for counsel's failure to object to the prosecutor's closing argument, the result of the proceeding would have been different. The Petitioner is not entitled to relief.

## V

The Petitioner contends that trial counsel rendered ineffective assistance by failing to require the State to elect a single means by which the charged offenses were committed. He argues that because the State had to establish either that he was armed with a deadly weapon or that he caused serious bodily injury in order to convict him for aggravated spousal rape, especially aggravated kidnapping, and aggravated robbery, election was required to ensure that the jury's verdict was unanimous as to which aggravating factor was found. The State contends that it is not required to elect the means by which an offense was committed when it presents evidence of a single offense and proves alternative elements to establish the offense. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). "When the evidence does not establish that multiple offenses have been committed, however, the need to make an election never arises." State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000) (stating that no election is required for continuing offenses). Consequently, the trial court may properly submit to the jury multiple counts embodying different theories for committing a single offense. See State v. Lemacks, 996 S.W.2d 166, 171-72 (Tenn. 1999) (holding that no election was required when proving alternative theories of guilt for one offense of driving under the influence of an intoxicant); State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998) (holding that counts alleging premeditated and felony murder may be submitted to the jury for a single homicide). When alternative means of committing a single offense are proven, election is not required. Christopher Lovin v. State, No. E2009-00939-CCA-RM-PC,

Claiborne County, slip op. at 16-17 (Tenn. Crim. App. Nov. 10, 2010), perm. app. denied (Tenn. Apr. 14, 2011).

Although the Petitioner was charged with multiple crimes, a single continuing offense supported each of the charges. With regard to the Petitioner's convictions for especially aggravated kidnapping and aggravated robbery, the proof showed alternative means of committing the offense, either through the use of a deadly weapon or by causing serious bodily injury, not alternative offenses. No election was required. With regard to his conviction for aggravated spousal rape, the proof showed only that the Petitioner caused serious bodily injury while committing the rape, not that he used a weapon. The Petitioner has not shown that counsel were deficient by failing to require election or that he was prejudiced as a result. The Petitioner is not entitled to relief.

**VI**

The Petitioner contends that counsel rendered ineffective assistance by failing to object to an improper definition of "knowingly" during the jury instructions and that he was prejudiced because the improper instruction lessened the State's burden of proof for his attempted second degree murder conviction. The State contends that although the jury instruction was improper, the error was harmless and the Petitioner suffered no prejudice as a result. We agree with the State.

In criminal cases, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792. An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

Tennessee Code Annotated section 39-11-106(a)(20) states,

> "Knowing" means that a person acts knowingly with respect to
> the conduct or to circumstances surrounding the conduct when
> the person is aware of the nature of the conduct or that the

-27-

circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

In State v. Page, this court stated that because a knowing second degree murder is strictly a "result-of-conduct" offense,

A jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death.

81 S.W.3d 781, 787-88 (Tenn. Crim. App. 2002); see also State v. J.D. Jones, No. E2003-01565-CCA-R3-CD, Claiborne County (Tenn. Crim. App. July 9, 2004) (stating that attempted second degree murder is a result-of-conduct offense), perm. app. denied (Tenn. Dec. 6, 2004). In Faulkner, our supreme court clarified and narrowed the holding in Page and stated that "superfluous [nature-of-conduct] language in the 'knowingly' definition did not lessen the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly." 154 S.W.3d at 59. Providing a definition of knowingly that contains superfluous nature-of-conduct language is not "an error of constitutional dimension when the instruction also includes the correct result-of-conduct definition." Id. This court has previously rejected claims that trial counsel are ineffective for failing to object to jury instructions that defined "knowingly" using both nature-of-conduct and result-of-conduct language when a defendant was convicted of second degree murder. See Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, Shelby County, slip op. at 17 (Tenn. Crim. App. Jan. 15, 2010), perm. app. denied (Tenn. May 11, 2010); Terry Jamar Norris v. State, No. W2005-01502-CCA-R3-PC, Shelby County, slip op. at 13 (Tenn. Crim. App. July 26, 2006), perm. app. denied (Tenn. Dec. 18, 2006); see also Benjamin Hernandez v. State, No. M2004-01798-CCA-R3-PC, Putnam County (Tenn. Crim. App. June 28, 2005) (finding that an improper definition of knowing that included nature-of-conduct language was harmless error and did not prejudice the defendant when evidence established that the defendant was aware that his conduct was reasonably certain to result in death), perm. app. denied (Tenn. Nov. 7, 2005).

Here, the trial court instructed the jury using both nature-of-conduct and result-of-conduct language when providing the definition of knowingly. Trial counsel conceded that they failed to object to this definition. In denying post-conviction relief, the trial court found that no prejudice resulted from the improper definition because the definition merely

contained superfluous language that was not reasonably likely to mislead the jury into convicting the Petitioner and because "there were no facts presented in this case from which an argument could be made that when [the Petitioner] engaged in violent conduct with the victim in this case, he was unaware that his conduct could reasonably result in the death of the victim." We agree.

The record reflects that before the attack, the Petitioner sent the victim electronic pages using a numeric code that stated, "Till death do us part" and "Death by rape." The next day, he attacked the victim in her home and choked her until she was unconscious. The victim regained consciousness while being raped and the Petitioner told her that he would kill her. He then choked her again until she was unconscious. When she regained consciousness, the Petitioner told her that he could not believe she was alive and that "he thought for sure he had [her] that time." The evidence established that the Petitioner was aware his conduct was reasonably certain to result in the victim's death. We hold that the Petitioner has not shown that he was prejudiced by trial counsel's failure to object to the improper definition of knowingly during jury instructions. The Petitioner is not entitled to relief.

## VII

The Petitioner contends that counsel rendered ineffective assistance by failing to preserve issues for appeal. He argues that counsel waived the issue of the State's failure to preserve material evidence, including the weapon the victim stated he used in the van and the underwear he wore on the night of the attack, by failing to include the error in the motion for a new trial and that this evidence would have played a significant role in his defense. The State contends that the Petitioner has not shown that counsel were deficient or that he suffered prejudice due to their failure to object to the State's failure to preserve this evidence. We agree with the State.

In State v. Ferguson, our supreme court stated that the critical inquiry in determining the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory is whether "a trial, conducted without the destroyed evidence, would be fundamentally fair?" 2 S.W.3d 912, 914 (Tenn. 1999). The threshold consideration in this analysis is whether the State had a duty to preserve the evidence. Id. at 917. The State has a general duty to "preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. If the State had a duty to preserve the evidence and failed in that duty, the court should consider the following factors in determining the consequences of that error: (1) the degree of negligence involved, (2) the significance of the lost or destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the

sufficiency of the other evidence used at the trial to support the conviction. Id. at 917. If the trial court determines that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges or craft such orders as may be appropriate to protect the defendant's right to a fair trial. Id.

In denying relief on this ground, the trial court found that counsel were not ineffective by failing to include this issue in the motion for a new trial and that the Petitioner was not prejudiced because there was no evidence that the State was negligent in failing to preserve the evidence and no showing that the items were exculpatory. The trial court also found that the evidence introduced at the trial was "more than sufficient" to support the convictions.

With regard to the underwear the Petitioner wore on the night of the crimes, Detective Yother testified that he received clothing collected from the Petitioner at the county jail, including a bag stating that it contained "underwear." In reality, the bag contained a pair of socks. The Petitioner alleges that he was prejudiced by the State's failure to preserve his underwear because it "could have played a significant role in his defense," but he offers no explanation as to how it would have assisted his defense. The Petitioner has not established that counsel were deficient by failing to preserve this issue for appeal or that he was prejudiced as a result.

With regard to the club the victim stated the Petitioner had in the van, the State conceded at the trial that it was not recovered until seven days after the crimes and that the van was at the victim's home and accessible to the victim during those seven days. The State also conceded that the club was not preserved after it was recovered. The Petitioner argues that the State's failure to preserve the weapon and counsel's failure to preserve the issue for appeal prejudiced his ability to prepare a defense. The Petitioner does not contend that the weapon was exculpatory but he notes that the weapon presented by the State before the trial was made of wood and that the victim testified at the trial that the Petitioner was armed with a metal weapon. Trial counsel stated that it was a strategic decision to have the weapon suppressed before the trial and, as a result, there was no weapon in evidence to compare with the victim's testimony and no evidence of a conflicting statement to present to the jury to undermine the victim's credibility. This court has previously held that the evidence was sufficient to support the Petitioner's convictions and there is no indication that a trial without the weapon was fundamentally unfair. We hold that the Petitioner has not established that counsel were deficient by failing to preserve this issue for appeal or that he was prejudiced as a result.

**VIII**

The Petitioner contends that counsel rendered ineffective assistance by failing to object to his prosecution under Tennessee Code Annotated section 39-14-404 because it

allowed the State to obtain multiple convictions based on the same criminal conduct. The State contends that because the Petitioner's conviction for especially aggravated burglary was modified to aggravated burglary, he cannot show that he was prejudiced by trial counsel's actions. We agree with the State.

Tennessee Code Annotated section 39-14-404(d) states that "[a]cts which constitute an offense under this section may be prosecuted under this section or any other applicable section, but not both." T.C.A. § 39-14-404(d). "Subsection (d) prohibits using the same act to prosecute for especially aggravated burglary and another offense." State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993) (holding that T.C.A. § 39-14-404(d) precluded convictions for both especially aggravated burglary and aggravated rape when serious bodily injury was an element of both offenses); see also State v. Angela Manning, No. 03C01-9501-CR-00012, Bradley County, slip op. at 26-27 (Tenn. Crim. App. Feb. 27, 1998) (holding that T.C.A. § 39-14-404(d) precluded simultaneous convictions for especially aggravated burglary, especially aggravated kidnapping, and especially aggravated robbery when serious bodily injury was an element of each offense), perm. app. denied (Tenn. Nov. 2, 1998). The appropriate remedy for improper simultaneous convictions under Tennessee Code Annotated section 39-14-404(d) and other applicable sections is to modify the especially aggravated burglary conviction to aggravated burglary. See Holland, 860 S.W.2d at 60; Angela Manning, slip op. at 26-27.

Here, the effect of Tennessee Code Annotated section 39-14-404(d) was that the Petitioner could not be simultaneously convicted of especially aggravated burglary, aggravated robbery, aggravated spousal rape, and especially aggravated kidnapping when the serious bodily injury of the victim was an element of each offense. Accordingly, the trial court amended the conviction for especially aggravated burglary to aggravated burglary. His convictions no longer ran afoul of Tennessee Code Annotated section 39-14-404(d). We hold that the Petitioner has not established that he was prejudiced by trial counsel's failure to object to his prosecution under both Tennessee Code Annotated section 39-14-404 and other applicable sections. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE